United States District Court
Southern District of Texas
**ENTERED**
September 24, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Adel S. O/B/O MS,[1] | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action H-25-1869 |
| | § | |
| Frank J. Bisignano,[2] | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Plaintiff Adel S., on behalf of his minor child, appeals the Social Security Administration Commissioner's final decision denying his child's application for Social Security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 9; and the Commissioner's Response and Cross Motion for Summary Judgment, ECF No. 17. The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes, including entry of final judgment. ECF Nos. 12, 15. Plaintiff's Motion for Summary Judgment is **GRANTED**. The Commissioner's Motion for Summary Judgment is **DENIED**. The case is **REMANDED** for additional administrative proceedings consistent with this opinion.

---

[1] In light of guidance received from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which states that there are significant privacy concerns in social security cases, the court refers to the Plaintiff only by their first name and last initial. The court also refers to the minor child in this case as "MS" and her mother as "YN."

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank J. Bisignano is substituted as the defendant in this suit.

### *1. Procedural Posture*

On October 9, 2017, MS was found to be disabled as of August 23, 2017, under Title XVI of the Social Security Act, due to her low birth weight under 1200 grams. Tr. 134–35.

The SSA conducted a continuing disability review (CDR) on April 29, 2019, and determined that MS was no longer disabled as of May 3. 2019. Tr. 131, 183–85. The SSA made the same determination upon reconsideration on October 23, 2019. Tr. 201–09.

Administrative Law Judge (ALJ) Roseann Dummer held a hearing on August 8, 2023, and found that MS was not disabled under the Act during the relevant period. Tr. 64–95, 143–71. Upon review, the Appeals Council (AC) found that ALJ Dummer evaluated opinion evidence "pursuant to 20 CFR 416.927 (prior rules) instead of 20 CFR 416.920c (current rules)." Tr. 174. The AC vacated the decision and remanded the case to another ALJ for further consideration of the opinion evidence and prior administrative findings in the record pursuant to the current rules. Tr. 172–80.

ALJ Robert Burdette held a second hearing on MS's claim on March 21, 2024. Tr. 96–121. MS's counsel was present at the hearing. Tr. 98. MS testified that she was six years old and in the first grade, and that her favorite subject in school was writing. Tr. 99. MS's mother, YN, then testified about MS's medical conditions, medical progress, and schooling, as well as MS's ability to independently initiate, sustain, or complete a task and her ability to function with her peers.

As to MS's medical conditions, YN testified that MS was born prematurely at twenty-four weeks. Tr. 100–01. She explained that MS was behind academically and socially: MS was not at reading level, had trouble making friends, and had trouble staying on task for longer than five minutes. Tr. 101. YN testified that MS

had level-one autism. Tr. 101. She explained that MS had an emotional regulation disorder, which caused excessive crying and problems with communication with others. Tr. 102. She testified that MS could not express her feelings or needs. Tr. 110. YN explained that changes to MS's routine caused MS emotional disturbance. *Id.* YN testified that MS experienced delayed processing and that her speech was unclear. Tr. 110, 118. YN stated that MS did not like to be touched, explaining that MS was averse to feeling anything wet on her skin, and that MS was particular about food textures. Tr. 103. She testified that MS was hyperactive and that MS wore a weighted smock for an hour a day to help with her separation anxiety. Tr. 103–04. She explained that MS's inadequate emotional regulation led MS to self-inflict pain, such as by pulling out her loose teeth and skipping stair steps. Tr. 104–05. YN testified that MS had also cut open her eye when she fell off a chair that she was rocking. Tr. 105. She also explained that MS intentionally put herself in dangerous situations, such as by running into the street and jumping off the diving board. Tr. 108. She also testified that MS had thrown chairs and vases and that she would bang and kick the shopping cart while out shopping. Tr. 110. YN testified that MS could not handle loud noises and that she got frustrated while doing activities like playing with building blocks. Tr. 108–09.

As to MS's medical progress, YN testified that MS had received speech therapy and mental health counseling. Tr. 106–07. YN explained that MS was receiving one-on-one counseling at school and that she received weekly in-home visits to regulate her emotions for about three months, but that those services did not help MS's condition. Tr. 107. She testified that MS had also received occupational therapy but that she no longer received that service. Tr. 112. She explained that MS had been prescribed

ADHD medication but that MS had not taken the medication because of a delay in insurance coverage. Tr. 112.

As to MS's schooling, YN testified that MS's school maintained a progress sheet and rotated her seat to improve her focus. Tr. 105. She explained that MS's school would be testing MS for dyslexia, as MS wrote her alphabet backwards and missed numbers when she counted from one to twenty. *Id.* She testified that MS's school pulled her out of class to receive math and reading resources and that MS received other accommodations at school. Tr. 105–06. She testified that MS had received accommodations in kindergarten and that her accommodations were mostly the same in the first grade. Tr. 115. YN explained that she had inquired about MS repeating the first grade, due to her developmental delays. Tr. 115. MS was treated by a speech therapist weekly throughout the school year, though YN testified that she did not notice any change in MS's speech. Tr. 106.

As to MS's ability to initiate, sustain, or complete tasks independently, YN testified that MS could not perform certain tasks on her own, such as going to the restroom, dressing herself, brushing her teeth, or feeding herself. Tr. 102–03. YN testified that if she gave MS food, MS would not eat it by herself, so YN had to feed MS. Tr. 111. She testified that MS was uncoordinated and that she did not perform tasks, such as putting socks on, in a normal manner. Tr. 112.

As to MS's relationship with others, YN testified that MS and her twin both have Attention Deficit Hyperactivity Disorder (ADHD). Tr. 104. She explained that MS caused problems with her twin brother, such as by hurting herself to gain attention. Tr. 109. She testified that MS did not have friends because she did not get along with others. Tr. 117. She explained that MS did not have social boundaries and that she could not collaborate with her peers in a group setting. Tr. 117–18.

After YN's testimony, the ALJ explained that he needed more information about MS's speech therapy. Tr. 119. He stated that MS's school records from October 2022 through October 2023 demonstrate MS's significant difficulty with focus and attention, impulsiveness, emotional dysregulation and self regulation, and compliance, which was consistent with YN's testimony. Tr. 119. He explained to YN that the SSA would schedule appointments for MS to attend and that he would render a decision upon receiving information from the SSA appointments and other missing information from MS's school. Tr. 120.

The ALJ issued his decision on August 13, 2024, finding that MS was no longer disabled as of May 3, 2019, and that she had not become disabled again since that date. Tr. 32–34, 35. Adel requested review of the ALJ's decision on MS's behalf, which the Appeals Council denied on February 27, 2025. Tr. 1–3. Adel timely filed a complaint in federal court on April 24, 2025. *See* ECF No. 1.

***2. Legal Standards***

The Social Security Act provides supplemental income to individuals with physical and mental disabilities who have limited income and resources. *See* 42 U.S.C. § 1382. "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

A child who has been found disabled must periodically undergo a continuing disability review to determine if she is still eligible for disability benefits. 20 C.F.R. § 416.994a(a). In conducting this review, the Commissioner uses a sequential, three-step medical improvement review standard (MIRS) evaluation: (1)

whether the impairment that the child had at the time of the SSA's most recent favorable determination has medically improved; (2) if so, whether the child's impairment still meets or equals the severity of the listed impairment that it met or equaled before; (3) if not, whether the child is currently "disabled under the rules in §§ 416.924(c) and (d)." 20 C.F.R. § 416.994a(b). The ultimate burden of proof lies with the Commissioner in termination proceedings. *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991); *see also Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) ("Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled.").

This court's review of the ALJ's disability determination is "highly deferential." *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (citations omitted). The court "ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Id.* "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision, but it may not reweigh the evidence or substitute its judgment. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### *3. Analysis*

#### *A. Step One*

At step one, the ALJ must determine whether there has been medical improvement in the impairment that the child had at the time of the SSA's most recent favorable determination, referred to as the comparison point decision (CPD). 20 C.F.R. § 416.994a(b)(1). "Medical improvement is any decrease in the medical severity of [the] impairment(s) which was present at the time of the most recent favorable decision," except for "minor changes in signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not a result in a finding that [the child's] disability has ended." 20 C.F.R. § 416.994a(c). If the child's impairment has medically improved, the ALJ proceeds to step two.

The ALJ stated that MS's most recent favorable determination (CPD) was the SSA's October 9, 2017 disability determination. Tr. 38. He stated that MS's CPD impairments were an "unspecified lack of expected normal psychological development in childhood and a developmental disorder of speech and language." Tr. 38–39. The ALJ also explained that MS was born prematurely, so her impairments met the criteria in Listing § 100.04A. Tr. 39 (citing Tr. 122). The court notes that the ALJ incorrectly identified MS's CPD impairment. According to the October 9, 2017 disability determination (CPD), MS's only diagnosis was low birth weight under 1200 grams. Tr. 135. In identifying MS's CPD impairment, the ALJ seems to conflate the CPD with the May 3, 2019, disability determination evaluation, which was an unfavorable determination. *See* Tr. 38–39 (stating additional impairments that the CPD did not include). Dr. Patricia Nicol found in her May 3, 2019 examination that MS had a "new" speech and language impairment, and she explicitly did not categorize this impairment as a CPD impairment. *See* Tr. 125. As

such, MS's CPD impairment did not include a speech and language impairment. Despite this discrepancy, as will be discussed next, the ALJ's finding of medical improvement pertaining to MS's low birth weight is supported by substantial evidence; as such, this is a harmless error.

The ALJ found that as of May 3, 2019, the medical severity of MS's CPD impairment, i.e., low birth weight, had decreased. Tr. 39. The ALJ noted that Dr. Ahmed Abdin's April 2019 neurological examination of MS was non-focal, reflecting MS's normal motor strength in her extremities. *Id.* (citing Tr. 773). The ALJ also noted that MS's April 2019 echocardiogram did not show any residual atrial level shunting (atrial-level deficit), though "it did not rule out a previously seen patent foreman ovale." *Id.* (citing Tr. 769). The ALJ further noted that Dr. Abdin "reported that the claimant had normal growth and development." *Id.* (citing Tr. 815). As such, the ALJ concluded that "[m]edical improvement occurred as of May 3, 2019." *Id.* The ALJ's step-one findings are supported by substantial evidence and are not in dispute.

### *B. Step Two*

At step two, the ALJ determines whether the "child's CPD impairment(s) still meets or medically or functionally equals the 'severity of the listed impairment' that it met or equaled at the time of the CPD." SSR 05-03p, 2005 WL 6491605 at *1 (Apr. 27. 2005);[3] 20 C.F.R. § 416.994a(b)(2). The Listings

[3] SSR 05-03p was rescinded and replaced by SSR 26-1p in March 2026. SSR 26-1p, 91 Fed. Reg. 2820 (Jan. 22, 2026). However, at the time of MS's hearing in March 2024, the effective Ruling was SSR 05-03p, so it applies here. Regardless of which Ruling applies, the result remains unchanged. *Compare* SSR 05-03p, 2005 WL 6491605 at *1–2 (Apr. 27. 2005) (as quoted), *with* SSR 26-1p, 91 Fed. Reg. 2820 (Jan. 22, 2026) ("We are also simplifying the instructions for considering functional equivalence in cases with a CPD on or after January 2, 2001. For those cases, SSR 05-03p instructed adjudicators to consider functional equivalence twice in the CDR process and we are eliminating that redundancy.").

describe impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 416.925(a). If the CPD impairment does not still meet or medically equal the CPD Listing, the ALJ considers whether the CPD impairment now functionally equals the listings. SSR 05-03p, 2005 WL 6491605 at *1 (Apr. 27. 2005).

The ALJ determines functional equivalence by evaluating the "whole child" and considering the child's "actual functioning in all settings." S.S.R. 09-1P, 2009 WL 396031, at *2 (2009). The ALJ evaluates six domains to determine functional equivalence: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established if the ALJ finds "marked" limitations in two domains, or an "extreme" limitation in one domain. *Id.* § 416.926a(d). A marked limitation is "more than moderate, but less than extreme," and "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). If the child's CPD impairment(s) does not still meet or equal the severity of that Listing, the ALJ proceeds to step three. SSR 05-03p, 2005 WL 6491605 at *1 (Apr. 27. 2005); 20 C.F.R. § 416.994a (b)(2).

The ALJ did not expressly determine that MS's CPD impairment (low birth weight under 1200 grams) no longer met or medically equaled Listing Section 100.04A. Listing Section 100.04 concerns low birth weight in infants from birth to attainment of age one, and Listing Section 100.04A specifically concerns a low

birth weight of less than 1200 grams. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Though the ALJ failed to expressly make this determination in his decision, it is clear from the record that MS's impairment no longer met or medically equaled Listing Section 100.04A. At the time of the ALJ's decision, MS was ten days short of turning seven years old. As such, her CPD impairment no longer met or medically equaled Listing Section 100.04A.

As to the functional equivalence analysis, the ALJ determined that MS's CPD impairment had not functionally equaled the Listings since May 3, 2019. Tr. 39. In making the functional equivalence determination, the ALJ appears to have conflated the step-two analysis with the step-three analysis. The question at step two is whether the CPD impairment, low birth weight, now functionally equals the Listings—not whether any additional medically determinable impairments that the child has developed since the CPD functionally equals the listing. The ALJ's analysis at step two mostly addresses the latter question, which is reserved for step three. Despite this, it is clear that MS's CPD impairment (low birth weight) did not functionally equal the Listings at the time of the ALJ's decision.

The ALJ's step-two finding is supported by substantial evidence and is not in dispute.

***C. Step Three***

At step three, the ALJ determines whether the child is currently disabled under the rules at 20 C.F.R. §§ 416.924(c) and (d). To make this determination, the ALJ uses a three-step approach: (1) whether the child has a medically "severe" impairment or combination of impairments; (2) if so, whether the child's impairment meets or medically equals the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) if not, whether the child's impairment functionally

equals the listings. 20 C.F.R. § 416.994a(b)(3); SSR 05-03p, 2005 WL 6491605 at *1 (Apr. 27. 2005). A child is not disabled at step three if the child's impairment or combination of impairments is not "severe," or if the child's impairment does not meet or equal the listings. *See* 20 C.F.R. § 416.994a(b)(3). An impairment or combination of impairments that "is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not severe. 20 C.F.R. § 416.924(c).

At the outset of the court's review of the ALJ's step-three findings, the court notes again that the ALJ's step-three findings were baked into his step-two findings. The ALJ also stated that his step-two analysis is the same as his step-three analysis. *See* Tr. 53. As such, the court addresses the ALJ's findings at step two in its review of the ALJ's step-three determination. The court turns next to an analysis of the ALJ's findings at each step of his step-three determination.

As to whether MS had a medically "severe" impairment or combination of impairments, the ALJ found that MS had not developed additional impairments since May 3, 2019. Tr. 52. As of May 3, 2019, the ALJ found that MS had the following medically determinable impairments: "unspecified lack of expected normal physiological development in childhood and a developmental disorder of speech and language." *See* Tr. 38–39. The ALJ also found that MS had the following non-severe impairments: "allergies, underweight status, and status post head laceration." Tr. 52. It appears that the ALJ found that MS's impairments as of May 3, 2019 were severe because the ALJ continued his analysis. *See* Tr. 52. If the ALJ had found that MS did not have a severe impairment or combination of impairments, his analysis would have terminated at this step. *See* 20 C.F.R. § 416.994a(b)(3).

As to whether MS's impairments met or medically equaled the Listings, the ALJ found that since May 3, 2019, MS had not had an impairment or combination of impairments that met or medically equaled one of the Listings. Tr. 52. The ALJ did not explain this finding, but Adel does not raise an argument that demonstrates that the ALJ's finding was incorrect.

As to whether MS's impairments functionally equaled the Listings, the ALJ determined that MS's impairments have not functionally equaled the Listings since May 3, 2019. Tr. 53. In making this determination, the ALJ stated that he considered the entire record, including testimony about MS's symptoms and records containing medical evidence, medical opinions, and prior administrative findings. Tr. 39.

The ALJ considered symptoms as described by MS's parents' testimony from the 2022 hearing and the 2024 hearing. The 2022 hearing mostly consisted of MS's father's testimony. The ALJ accurately summarized MS's father's 2022 hearing testimony. MS's father, Adel S., testified about MS's problems with focusing, processing information, and finishing tasks, as well as some of her physical impairments. Tr. 40. Adel testified that he and his wife had to hold MS's arm for her to focus on them and that they hugged MS to calm her down. *Id.* He testified that MS had broken items in her toy kitchen and had ripped up her coloring pages after she had started coloring. *Id.* He also testified that MS started tasks but did not complete them, such as putting her toys away and finishing activities like puzzles and building blocks. *Id.* He explained that MS had allergies, pain in her stomach, issues with balance, and problems with breathing. *Id.* YN's 2022 testimony addressed the same topics.

The ALJ's summary of YN's 2024 hearing testimony is also consistent with YN's statements, summarized above. Essentially, YN testified that MS has trouble communicating, focusing,

finishing tasks, and processing information and her emotions. Tr. 40. She explained that MS often had to repeat herself. *Id.* She also testified that MS disliked being touched and feeling lotion on her hands and face. *Id.*

The ALJ found that, while MS's medically determinable impairments could reasonably be expected to produce her alleged symptoms, MS's parents' statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 40. The court turns next to an analysis of that finding.

The ALJ considered medical evidence pertaining to MS's growth and development. The ALJ noted that YN reported that MS "was doing well" in her early childhood intervention program at Texana Clinic. Tr. 41 (citing Tr. 865). The ALJ acknowledged that a March 2019 physical therapy evaluation showed that MS "had a lack of expected normal physiological development in childhood." *Id.* (citing Tr. 761). On the other hand, the ALJ noted that MS had good coordination skills and that her strength was within functional limits. *Id.* The ALJ noted Dr. Abdin's April 2019 report that found that MS's growth and development were normal and that MS's neurological exam was non-focal (normal). *Id.* (citing Tr. 773, 815). The ALJ also noted that MS's October 2019 functional assessment showed that she "was doing well with gross and fine motor skills" and that she was running, using the stairs, throwing a ball, and scribbling. *Id.* (citing Tr. 926). The ALJ acknowledged that MS's Peabody Development Motor Scale evaluation in October 2020 showed that MS had below-average scores in grasping and motor integration and that she had poor object manipulation, Tr. 42 (citing Tr. 1441), but noted that MS had a good prognosis for her occupational therapy goals. *Id.* (citing Tr. 1124). The ALJ noted that a February 2021 examination by Jamie Florida reported that MS had an unspecified lack of normal

physiological development. *Id.* (citing Tr. 1136). The ALJ also noted that an October 2021 echocardiogram report found that MS was "asymptomatic from a cardiac standpoint" and that she "was active with overall good exercise and endurance." *Id.* (citing Tr. 1711).

The ALJ considered medical evidence about MS's speech. The ALJ acknowledged that Christina Farrens and Yolanda Carrasco, both speech pathologists, found in their 2019 and early 2020 speech evaluations that MS met the criteria for an expressive language disorder. Tr. 41 (citing Tr. 753, 755, 1177). On the other hand, the ALJ noted that MS responded well to her treatment at the Texana Clinic, as her August 2020 treatment note showed that MS had "increased her single word vocabulary to at least fifty single words." *Id.* (citing Tr. 1052). The ALJ acknowledged that MS's speech evaluation from June 2022 showed that MS had below-average scores in auditory comprehension and expressive language but that she maintained a good rehabilitation prognosis. Tr. 42–43 (citing Tr. 1618, 1622). The ALJ noted that Dr. Louisa Lohner's December 2022 examination showed that MS had fluent speech "with regular rhythm, rate, and tone," an average total language score, and a minor delay in her motor speech. Tr. 43 (citing Tr. 1606, 1615, 1688). The ALJ also noted that MS received a speech language consultative examination in 2024 from Jessena Elmore, a speech language pathologist, which reported that MS's "oral structures were adequate for speech production." *Id.* (citing Tr. 1833). The ALJ noted that Elmore's evaluation revealed the following test scores: average on sentence comprehension, low-to-very-low on word structure, and low-to-very-low on sentence recall. Tr. 43–44 (citing Tr. 1835). Although MS's Goldman-Friscoe test of articulation results showed that MS had a severe articulation disorder, the ALJ noted that MS's speech would be 80% intelligible to a familiar listener and 75% intelligible to an unfamiliar listener.

Tr. 44 (citing Tr. 1836). The ALJ also noted that MS's prognosis was "fair to good" with speech therapy. *Id.* (citing Tr. 1836).

The ALJ further considered medical evidence and education records pertaining to MS's social functioning abilities. The ALJ noted that August 2020 treatment notes reflected that MS left the room to regain attention that had shifted to her twin brother. Tr. 41 (citing Tr. 1046). The ALJ noted that MS's education records from Lantern Lane Elementary School in October 2020 showed that MS responded to simple commands or requests, started conversations with others, told stories, used communication to manipulate her environment, presented with appropriate pragmatic and social-language skills, and established rapport. Tr. 42 (citing Tr. 1683–84). The ALJ also noted that MS received average scores on adaptive and cognitive testing. *Id.* (citing Tr. 1685). The ALJ noted that Dr. Lohner's December 2022 examination included reports from MS's teachers that "she was kind and liked to help." Tr. 43 (citing Tr. 1692). The ALJ noted that education records from Jan Schiff Elementary School for the 2023-2024 school year included comments from teachers that MS was friendly, "a sweetheart," and "an amazing girl," and that she got along with her classmates and enjoyed affection. *Id.* (citing Tr. 1768, 1798). The ALJ also noted that in May 2024, MS received a consultative psychological evaluation from Dr. Michael Osborne, which showed that MS had fair memory functions and average intelligence. *Id.* (citing Tr. 1828). The ALJ also noted that MS's speech was clear and that she understood directions. *Id.* (citing Tr. 1828). The ALJ noted that Dr. Osborne diagnosed MS with "attention deficit hyperactivity disorder, oppositional defiant disorder, and a developmental disorder." *Id.* The ALJ also noted that Dr. Osborne stated that MS had limitations in the following areas: acquiring and using information, attending and completing tasks, and interacting with others. *Id.* (citing Tr. 1828).

The ALJ then considered the medical opinions and other prior administrative findings in the record. In doing so, the ALJ considered evidence from several sources. The ALJ's decision must articulate how persuasive he finds all the medical opinions and prior administrative medical findings in the record. 20 C.F.R. § 416.920c(b). In particular, the ALJ must explain his consideration of the supportability and consistency factors. 20 C.F.R. § 416.920c(b)(2). The supportability factor relates to how much the objective medical evidence and the medical source's explanation supports the medical opinion, while the consistency factor relates to the medical opinion's consistency with evidence from other medical sources. 20 C.F.R. § 416.920c(c)(1)–(2).

The applicable regulation sorts medical evidence into three categories: (1) objective medical evidence, (2) medical opinions, and (3) other medical evidence. *See* 20 C.F.R. § 416.913(a)(1)–(3). "Objective medical evidence is medical signs, laboratory findings, or both." *Id.* § 419.913(a)(1). "A medical opinion is a statement from a medical source about what [the child] can still do despite [the child's] impairment(s) and whether [the child has] one or more impairment-related limitations or restrictions" in the child's abilities in the six domains of functioning. *Id.* § 416.913(a)(2). Other medical evidence is evidence from a medical source that does not fall into the first two categories, "including judgments about the nature and severity of [the child's] impairments, [the child's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 416.913(a)(3).

Some of the evidence that the ALJ considered clearly does not constitute medical opinions or prior administrative medical findings. For example, the ALJ considered reports from Adel about MS's symptoms. Tr. 44. This does not constitute a medical opinion because Adel is not a medical source.

In contrast, some of the evidence the ALJ considered clearly constituted medical opinions and prior administrative medical findings. The ALJ considered an April 2019 consultative examination report from Dr. Patricia Nicol, a state agency medical consultant (SAMC). Tr. 44. The ALJ stated that Dr. Nicol reported that MS had a speech and language impairment. *Id.* He also stated that Dr. Nicol found that MS had a less than marked limitation in the domains of acquiring and using information, interacting and relating with others, and health and physical well-being, and that MS had no limitation in the domains of attending and completing tasks, moving about and manipulating objects, and caring for yourself. *Id.* The ALJ also considered a 2019 childhood disability evaluation form by Dr. Lesa Walker, another SAMC. Tr. 45. He noted that Dr. Walker reported that MS had a speech and language impairment and a developmental delay, as well as a history of prematurity and "BPD." *Id.* He also noted that Dr. Walker found that MS had a less than marked limitation in the domains of acquiring and using information, moving about and manipulating objects, and health and physical well-being, and that MS had no limitation in attending and completing tasks, interacting and relating with others, and caring for yourself. *Id.*

The ALJ did not, however, articulate how persuasive he found either Dr. Nicol's opinion or Dr. Walker's prior administrative medical finding. The ALJ failed entirely to address the supportability and consistency factors of persuasiveness in violation of 20 C.F.R. § 416.920c(b)(2), which mandates a discussion of these factors. This is error.

Moreover, the ALJ seems to have misunderstood the meaning of the consistency factor in the regulations. The ALJ stated that "[t]he opinions of the State Agency Medical Consultants are consistent with the limitations in this decision." Tr. 45. The consistency factor does not concern whether the ALJ's

own findings of limitation are consistent with the medical opinions or prior administrative medical findings in the record. That begs the question. The question is instead whether the medical opinion or prior administrative medical finding is consistent with "the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 416.920c(c)(2). The ALJ provides no such articulation. Nor does he provide any indication as to the external consistency of Dr. Nicol's opinion or Dr. Walker's prior administrative medical findings.

Throughout his step-three findings, the ALJ relies heavily on Dr. Michael Osborne's psychological consultative examination report. Dr. Osborne completed the examination at the ALJ's request on May 8, 2024. Tr. 1826. The ALJ considered Dr. Osborne's report in his review of the medical evidence as follows:

> The claimant reported that when she was not in school, she liked to go to the pool or cook. The claimant had friends at school, The claimant's mental status examination showed that the claimant was able to count from one to 10 forwards and backwards. Her memory functions were fair, and her intelligence was average. The claimant's speech was clear and she understood directions. The claimant put forth good effort. Even so, the claimant could not complete academic testing due to uncooperative behavior. Based on his examination of the claimant, Dr. Osborne diagnosed her with attention deficit hyperactivity disorder, oppositional defiant disorder, and a developmental disorder. The claimant had disorders of social functioning. Consequently, Dr. Osborne stated that the claimant had limitations in functioning in an age appropriate fashion, The claimant had limitations in acquiring and using information, attending and completing tasks, and interacting with other.

Tr. 43.

The ALJ also addressed Dr. Osborne's report in his findings in the domains of acquiring and using information and attending

and completing tasks. In his findings in the domain of acquiring and using information, the ALJ relied on Dr. Osborne's report, repeating Dr. Osborne's observations about MS's ability to count to one to ten, memory functions, intelligence, speech, and understanding of directions. Tr. 46. The ALJ repeated the same information from Dr. Osborne's report in his findings in the domain of attending and completing tasks. Tr. 47. The ALJ also repeated that MS "put forth good effort" but "could not complete academic testing due to uncooperative behavior." Tr. 47. After stating Dr. Osborne's finding that MS "had limitations in functioning in age appropriate fashion" and that she "had limitations in attending and completing tasks," the ALJ found that Dr. Osborne did not quantify or explain the specifics of the limitations. *Id.* The court turns next to an analysis of the ALJ's consideration of Dr. Osborne's report.

Dr. Osborne's report constitutes a medical opinion. Dr. Osborne is a licensed psychologist, so he is an acceptable medical source. 20 C.F.R. § 416.902(a)(2). Under a heading titled "functional capacity," Dr. Osborne's report states that MS functioned "below that of age-related peers," and that MS "display[ed] limitations to function effectively in an age-appropriate fashion" in the domains of acquiring and using information, attending and completing tasks, and interacting with others. Tr. 1830. Elsewhere in Dr. Osborne's report, he states that MS's "severe lack of anger management result[ed] in aggression or assaultive behaviors," Tr. 1828, touching on the domain of interacting and relating with others. As such, Dr. Osborne's statement about MS's functional limitations in the domains of functioning is a medical opinion. *Cf. Vargas v. Kijakazi*, No. 20-cv-5927, 2022 WL 3099768, at *7 (E.D. Pa. Aug. 4, 2022) (finding that a statement about the claimant's minimal social functioning, among other feelings and behaviors, under a heading entitled

"functional limitations" constituted a medical opinion). *Compare Armstrong ex. rel A.L.J. v. Saul*, No. 19-12687, 2022 WL 4353191, at *5 (E.D. Mich. July 9, 2020), *R. & R. adopted*, 2020 WL 4349847 (E.D. Mich. July 29. 2020) (determining that findings from acceptable medical sources constituted medical opinions because they addressed how the child's impairments limited certain components of the acquiring and using information domain, such as abilities to respond to instructions and questions), *with Addimando v. Comm'r of Soc. Sec.*, No. 1:24-CV-335 JD, 2025 WL 2318387, at *3 (N.D. Ind. Aug. 11, 2025) (finding that a report containing information only about previously established diagnoses, medical history, and already-mentioned diagnoses did not constitute a medical opinion).

Because Dr. Osborne's report constitutes a medical opinion, the ALJ was required to articulate how persuasive he found Dr. Osborne's report. It is unclear to the court how the ALJ evaluated the persuasiveness of Dr. Osborne's report. It appears that the ALJ provided some analysis on the supportability of Dr. Osborne's opinion in one domain of functioning; he stated that Dr. Osborne "did not quantify or explain the specifics of the limitations" in his report, Tr. 47, which address the explanation aspect of the supportability factor. The ALJ, however, did not address whether Dr. Osborne's opinion was supported by the relevant objective medical evidence. Nor did the ALJ articulate the consistency of Dr. Osborne's opinion with evidence from other medical sources in the record. This is error. *See Armstrong*, 2025 WL 4353191, at *5 (remanding because the ALJ did not discuss the persuasiveness of neurologists' and psychologists' findings, which constituted medical opinions).

The ALJ's decision must stand or fall for the reasons stated in the ALJ's decision. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014)

(stating that the court "may affirm only on the grounds that the Commissioner stated for his decision"). It is improper for the court to provide a post hoc rationale for the ALJ's decision. Doing so would "usurp[] the agency's function of weighing and balancing the evidence in the first instance." *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008). The court recognizes that procedural perfection is not required, and that, in some cases, it is patent from the face of the decision how the ALJ reached his conclusions. That is not the case here. Because the ALJ did not fully address the necessary factors, the court is unable to perform the statutorily mandated review.

The ALJ's failure to articulate the persuasiveness of the medical opinions and prior administrative medical findings in the record was not harmless. At the outset of the harmless error analysis, the court notes that the government fails to address whether Dr. Osborne's report constitutes a medical opinion and whether the ALJ's failure to address the supportability and consistency of Dr. Osborne's report caused harm. *See* ECF No. 17 at 11–14. The government instead argues that reports by Christina Farrens, Yolanda Carrasco, and Jamie Florida, who each examined MS's speech in 2019, 2020, and 2021 respectively, were not medical opinions and that the ALJ was therefore not required to evaluate their persuasiveness. *Id.*

Adel argues at length that the ALJ's evaluation of Dr. Michael Osborne's report is legally insufficient to allow for meaningful judicial review. ECF No. 9 at 3–9; ECF No. 18 at 7–9. He argues that if the ALJ had provided a persuasiveness finding, it is conceivable that he could have reached a different result. ECF No. 9 at 8–9; ECF No. 18 at 7–9. The court agrees.

On the state of the record, it is nearly impossible for the court to undertake the administrative review because the court can only guess as to what medical opinions the ALJ found

persuasive, why the ALJ found medical opinions persuasive, and which parts of the medical opinions that he found persuasive. The ALJ provides no indication as to whether or why Dr. Nicol's opinion and Dr. Walker's findings were persuasive. It appears from the ALJ's heavy reliance on Dr. Osborne's report that the ALJ found that report at least somewhat persuasive. But the ALJ did not even address most of the objective medical evidence in Dr. Osborne's report.[4] In his report, Dr. Osborne observed that MS's concentration and attention appeared poor and that she "refused to spell her name." Tr. 1828. He also found that MS's "severe lack of anger management results in aggression or assaultive behaviors" and reported that MS had ignored certain questions. *Id.* In observing MS's behavior, Dr. Osborne reported that MS "required constant incentive and redirection to stay on task," "was more invested in fulfilling her own impulsive ideas," and "was blatantly oppositional and appeared to find pleasure in provoking." Tr. 1829. Due to the ALJ's failure to address most of Dr. Osborne's findings, the court must grasp at straws to determine if and why the ALJ found Dr. Osborne's report persuasive, as well as which parts of Dr. Osborne's report the ALJ found persuasive.

The court will not guess what the ALJ would have done had he addressed the consistency and supportability of the medical opinions and prior administrative medical findings in the record. The court concludes that the error was not harmless, and reversal and remand are warranted. The court does not reach and does not express any opinion about the other arguments that Adel raises in

---

[4] In pointing out Dr. Osborne's findings that the ALJ did not address, the court is not reweighing or balancing the evidence before the ALJ. The court's purpose in discussing Dr. Osborne's findings is to illustrate the prejudice caused by the ALJ's improper evaluation of Dr. Osborne's medical opinion. The court does not express any opinion as to whether the ALJ should have found that Dr. Osborne's opinion was supported by the evidence in the report.

his motion for summary judgment. The court also expresses no opinion about what limitations the ALJ should find or whether MS is disabled.

### *4. Conclusion*

The ALJ's decision denying social security benefits is not consistent with the law or supported by substantial evidence. Summary judgment in favor of Adel is therefore appropriate. Fed. R. Civ. P. 56(a), (c). Accordingly, Plaintiff's Motion for Summary Judgment, ECF No. 9, is **GRANTED**. Commissioner's Motion for Summary Judgment, ECF No. 17, is **DENIED**. This case is **REMANDED** for additional proceedings consistent with this opinion.

A separate final judgment will be entered.

Signed at Houston, Texas, on September 24, 2026.

Peter Bray
United States Magistrate Judge